UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SONJA FLYNN**,                                      Case No. 1:11 CV 759

            Plaintiff,                        Magistrate Judge James R. Knepp II

    v.                                        MEMORANDUM OPINION AND
                                            ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

            Defendant.

### INTRODUCTION

Plaintiff Sonja Flynn appeals the administrative denial of supplemental security income (SSI) and disability insurance benefits (DIB) under 42 U.S.C. § 1383(c) and 42 U.S.C. § 405(g), respectively. The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3) and 42 U.S.C. § 405(g). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court remands the case to the Commissioner.

### BACKGROUND

Plaintiff filed applications for DIB and SSI on February 10, 2006, alleging a disability onset date of June 10, 2004. (Tr. 84–93). Both applications were denied initially (Tr. 67–76) and upon reconsideration (Tr. 58–63). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 57). Born in 1953, Plaintiff was 55 years old at the time of the ALJ's hearing.

Medical History

Plaintiff's medical problems stem from her bipolar disorder, depression, hepatitis C, rectocele, hernias, high blood pressure, hyperthyroidism, and pain in her neck and back.

(Tr. 137–138, 142).[1] Records from her primary care physician show Plaintiff has also had past problems with fibrocystic breast disease, esophageal reflux, and alcohol and drug abuse. (Tr. 257–258). An SSA employee interviewed her at the time she made her applications, and noted that she "drifts off onto other subjects and doesn't seem to be able to focus. [S]he has extreme difficulty remembering dates and facts". (Tr. 146). However, the SSA employee observed no difficulty in Plaintiff's understanding or coherency. (Tr. 145). Plaintiff indicated in forms she filled out for SSA that she has been dependent on her daughter. (Tr. 153–154).

Between 1996 and 2002, Plaintiff was hospitalized three times for depression. (Tr. 517). Plaintiff obtained counseling but still frequently felt depressed. (Tr. 522–526, 532). Her counselors and treatment providers at the time maintained diagnoses of depression, bipolar disorder, and personality disorder with borderline and paranoid features. (Tr. 547, 580, 591, 593, 596, 598). Eventually, Plaintiff began seeing psychiatrist Daniel Ionescu, M.D., for psychotherapy, and continued doing so regularly for several years.

In December 2003, Dr. Ionescu noted Plaintiff was hearing voices and having paranoid thoughts about individuals of a particular ethnicity. (Tr. 432). The following month, Dr. Ionescu said Plaintiff was "[l]ess psychotic, [i]mproved" with no suicide or homicide risk. (Tr. 435). Dr. Ionescu also reported no abnormal or psychotic thoughts, fair judgment, and a logical, organized thought process. (Tr. 434). These findings were repeated when Plaintiff returned to Dr. Ionescu. (Tr. 441, 453). The following December, Dr. Ionescu characterized Plaintiff's judgment and insight as

---

1. Because only Plaintiff's fecal incontinence and mental residual functional capacity are relevant to this appeal, the Court will not include much discussion of Plaintiff's various unrelated physical problems in this summary of her medical history. Plaintiff has waived any argument on the Commissioner's findings not related to these issues. *See Stiltner v. Comm'r of Soc. Sec.*, 244 F. App'x 685, 686 (6th Cir. 2007).

2

questionable, but otherwise made very similar findings. (Tr. 455).

As part of a routine evaluation to establish care in October 2005, Plaintiff had a rectal exam performed by Jeffrey Rosenberg, M.D. (Tr. 450). Dr. Rosenberg noted a "[n]ormal sphincter tone", no palpable masses, and no external hemorrhoids. (Tr. 450). Plaintiff then had a colonoscopy performed in December 2005, which revealed no palpable lesions but "some very small internal/external hemorrhoidal complexes" in the anorectal canal. (Tr. 459).

In January 2006, Plaintiff was referred to colorectal surgeon James Merlino, M.D., because of her complaints of fecal incontinence and rectal bleeding. (Tr. 462). Dr. Merlino remarked "[Plaintiff] has had problems with incontinence to loose stools . . . She is continent to formed and hard stools. She will occa[s]ionally have incontinence at night." (Tr. 462). Dr. Merlino noted Plaintiff's reports of having one to two "soft bowel motions each day." (Tr. 462). On physical examination of Plaintiff's rectum, Dr. Merlino reported "no masses, lesions, or strictures" that were palpable, but noted "the tone was weak, and the squeeze was weak." (Tr. 463). Dr. Merlino found "grade III hemorhoids on her left lateral, right anterior[,] and posterior bundles." (Tr. 463). Dr. Merlino's impression following this exam included incontinence and "three quadrant hemorrhoids". (Tr. 464). Among other things, he planned for Plaintiff to have an anal ultrasound. (Tr. 464).

Plaintiff underwent the prescribed anal ultrasound later that month. (Tr. 467). It revealed an intact lower and internal sphincter but "attenuation of the mid to upper external sphincter suggesting a defect." (Tr. 467). A thin perineal body was also noted. (Tr. 467). Meanwhile, Plaintiff continued psychotherapy with Dr. Ionescu, who reported a hypomanic but stable state with no potential to harm herself or others. (Tr. 469). Dr. Ionescu altered Plaintiff's prescribed medications at this point after Plaintiff reported difficulty sleeping. (Tr. 469, 471).

3

At a followup with Dr. Ionescu in March 2006, Plaintiff was "irritable and depressed", having flight of ideas, and reportedly unable to function at home. (Tr. 473). Dr. Ionescu noted Plaintiff had poor judgment, paranoid ideation, and expressed feelings of agitation. (Tr. 473). For the first time, Dr. Ionescu determined Plaintiff "is unstable; unable to manage her life and very irritable; she may be at risk of hurting herself or others because of hopelessness/helplessness and/or poor insight and externalization of blame." (Tr. 474). Accordingly, Dr. Ionescu sent Plaintiff to the ER for hospitalization. (Tr. 474).

Once at the hospital, Plaintiff tested positive for marijuana. (Tr. 483, 492). She was kept overnight after being verbally abusive and admitting to suicidal and homicidal ideation, and then referred to the North Coast Behavioral Center. (Tr. 475, 482, 486). There, Plaintiff was kept for almost a week and exhibited manic, irritable behavior. (Tr. 492). She was discharged once "significant improvement in her manic signs" was observed. (Tr. 494). Upon discharge, Plaintiff had no suicidal or homicidal ideation, had good judgment and insight, and denied feeling depressed. (Tr. 494).

In June 2006, Dr. Ionescu began reporting Plaintiff felt "somewhat depressed" because of her financial situation, but denied suicidal or homicidal ideation. (Tr. 363). Dr. Ionescu found Plaintiff to be oriented, cooperative, and logical, with fair judgment and insight, and no abnormal or psychotic thoughts. (Tr. 363). He repeated these findings at a second appointment later in the month, before transferring Plaintiff's care to psychiatrist Sunyata Austin, D.O. (Tr. 365). That same month, however, Plaintiff was hospitalized for an overdose on pills following an altercation with her ex-husband. (Tr. 281–291). Police brought Plaintiff to the emergency room because of "bizarre behavior", and she was put in restraints until she settled down. (Tr. 283). Hospital personnel noted

she was intoxicated and bipolar. (Tr. 283, 285). A psychological assessment in the hospital reported irritability and mood swings with no other psychological issues exhibited. (Tr. 281). Plaintiff's orientation, memory, and concentration were said to be grossly intact. (Tr. 282). Her insight and judgment were ranked as fair, though her fund of knowledge was reportedly below average. (Tr. 282). Plaintiff's overdose was deemed a suicide attempt, and she was discharged the following day with instructions to follow up with a psychiatrist. (Tr. 285, 287).

Later in June, Plaintiff had a pap smear done and the physician who performed it noted a "stage II rectocele". (Tr. 370). Not long thereafter, Plaintiff saw urogynecologist Jeffrey M. Mangel, M.D., complaining of having "symptomatic rectocele" for about a year, having gotten worse since early 2006. (Tr. 332). Dr. Mangel reported Plaintiff felt an uncomfortable "pouch", but "does not manipulate to void or have BM[, though she] does feel it more when she moves her bowels." (Tr. 332). Dr. Mangel noted Plaintiff's fecal urgency and incontinence, but said Plaintiff "saw Dr. Merlino, minimal sphincter attenuation, surgery not recommended; high fiber suggested". (Tr. 332). On examination, Dr. Mangel noted a stage two rectocele, a stage one or two uterine prolapse, and a fair rectal tone. (Tr. 334). His final assessment included "[f]ecal urgency, occ[asional] incont[inence] of loose stool". (Tr. 334).

Plaintiff followed up with her primary care physician at the time, Maya Merheb, M.D. (Tr. 367–368). Dr. Merheb noted Plaintiff had been seen by specialists for complaints of fecal incontinence and bloody stool. (Tr. 367). Plaintiff's sphincter was deemed not to need surgical repair, but because Plaintiff planned on having hernia repairs done anyway, a combined surgery to fix Plaintiff's rectocele during the same operation was planned. (Tr. 367). As for Plaintiff's mental impairments, Dr. Merhab reported Plaintiff was not suicidal or homicidal, and denied auditory or

visual hallucinations. (Tr. 368).

Following a transfer of care from Dr. Ionescu, Dr. Austin provided psychotherapy to Plaintiff regularly over the course of two years. Plaintiff saw Dr. Austin in September 2006, at which time she said Plaintiff had "decreased alcohol use" and showed no abnormal or psychotic thoughts. (Tr. 215). Plaintiff was noted to be in an irritable, frustrated mood, but had reportedly fair judgment and insight, a logical thought process, good memory, and sustained attention span and concentration. (Tr. 215–216).

Also in September 2006, Plaintiff was seen by Ellen J. Gelles, M.D. (Tr. 217). Dr. Gelles reported Plaintiff had been drinking six beers a day on weekends "and using marijuana 'when her friends buy it' as she has no money." (Tr. 217). Dr. Gelles noted there was no blood in Plaintiff's stool. With regards to Plaintiff's rectocele, Dr. Gelles noted a "[s]urgery planned for same time as hernia repair." (Tr. 218).

In October 2006, Plaintiff returned to Dr. Austin for psychotherapy. (Tr. 220–221). Again, Dr. Austin observed no abnormal thought processes, no derailment or disorganized thoughts, no delusional speech, and no paranoia. (Tr. 220). She noted Plaintiff denied suicidal and homicidal thoughts or intention, and denied auditory and visual hallucinations. (Tr. 220). Plaintiff's attention span and concentration were said to be sustained. (Tr. 220). At Plaintiff's next followup with Dr. Austin, in November 2006, Dr. Austin reported Plaintiff indicated "if she does not end up getting social security she plans on starting to work full time in order to move from [her] ex-husband[']s home." (Tr. 222). Again, Dr. Austin noted a lack of abnormal or psychotic thoughts, and sustained attention span and concentration. (Tr. 222). Plaintiff had been having trouble affording her prescribed Effexor, so she was given samples of it. (Tr. 223).

In December 2006, Plaintiff was hospitalized for depressed mood and suicidal thoughts. (Tr. 296). Plaintiff was intoxicated and had overdosed on her Seroquel reportedly in an attempt to sleep better, but doctors questioned whether it was a suicide attempt. (Tr. 297, 315–316, 319–323, 325). She reported drinking alcohol daily and using marijuana three times a week. (Tr. 309). Plaintiff was discharged in stable condition after adjustments to her Seroquel, Effexor, and Lithium, and was advised to seek alcohol treatment. (Tr. 295–296, 299).

Plaintiff returned to Dr. Austin in January 2007, whereupon she repeated her usual non-psychotic findings. (Tr. 224). Plaintiff was "stable but stressed" and not having any side effects from her medication. (Tr. 224). Dr. Austin continued Plaintiff on Effexor and Lithium, and advised abstinence from alcohol. (Tr. 224–225). When Plaintiff came back at the end of the month for a followup, she had "been unable to get her medications because of the $2 copay" and was "smoking marijuana daily and using alcohol" with her ex-husband. (Tr. 226). This did not change the observations Dr. Austin reported, though; Plaintiff still had no abnormal or psychotic thoughts, a logical, organized thought process, no hallucinations, tight association, and sustained attention span and concentration. (Tr. 226). At this visit, Plaintiff was unsure whether she would be able to stay out of jail in the near future because of a pending aggravated disorderly conduct charge. (Tr. 227).

In June 2007, Plaintiff was assessed at the Hitchcock Center for Women, on referral from the state following a six-week incarceration. (Tr. 195–198). The counselors there reported Plaintiff admitted that before her stint in jail, she was drinking six beers every day, but at the time of the evaluation, Plaintiff had been sober since before going to jail. (Tr. 195). The assessment recited diagnoses of alcohol dependence without psychological dependence, bipolar disorder, depression, hypertension, acid reflux, hepatitis C, and hypothyroidism. (Tr. 196, 201). Plaintiff was admitted

to the Hitchcock Center for two months, during which time she expressed a desire to avoid relapses on alcohol and actively participated in the treatment process to prevent them. (Tr. 197, 199). Upon discharge, her relapse potential was rated as "low", and she reportedly had developed coping skills and awareness of sobriety support systems. (Tr. 200).

In July 2007, Plaintiff returned to Dr. Austin for more psychotherapy. (Tr. 228). Dr. Austin wrote that Plaintiff "has been feeling better since being sober." (Tr. 228). Plaintiff wanted to come off various medications because she was feeling calmer. (Tr. 228). Dr. Austin again noted no abnormal or psychotic thoughts, a logical, organized thought process with tight association, and sustained attention span and concentration. (Tr. 228–229). She tapered Plaintiff off of Effexor and Seroquel, continued her on Lithium, and started her on Rozarem to help her sleep. (Tr. 228–229). Dr. Austin also noted a "history of poor treatment compliance", chronic poor adjustment, and substance dependence. (Tr. 231).

Dr. Austin repeated her usual mental findings in August 2007, at which point Plaintiff was reportedly sober. (Tr. 234). Dr. Austin ordered an EKG, kept Plaintiff on the same medications despite her weight gain from taking Lithium, and advised her to start taking Geodon in the near future. (Tr. 235). At her next followup, in October of that year, Plaintiff had started taking Geodon and her alcohol dependence was noted to be in remission. (Tr. 237). Dr. Austin reported no change to her psychological symptoms, and then adjusted her medications slightly. (Tr. 238–239).

Also in October 2007, Plaintiff saw gynecologist Michelle Catenacci, M.D., for a pap smear and breast exam. (Tr. 242). Upon physical examination, Dr. Catenacci reported a "[s]tage 2 rectocele". (Tr. 243). She advised Plaintiff to followup with "Dr. M[a]ngel for rectocele if [it] becomes symptomatic again". (Tr. 243).

8

Plaintiff was incarcerated again in 2008, this time for three months. (Tr. 245). Upon being released, Dr. Austin maintained her findings of no abnormal or psychotic thoughts, logical and organized thought process, and sustained attention span and concentration. (Tr. 245). She noted Plaintiff was struggling to accept that some of her personal property was lost while she was in jail, but Plaintiff was "hopeful about her future". (Tr. 245). However, Plaintiff stopped taking her medications that summer so she could stay awake to care for her dying father. (Tr. 270). Though there was family drama in her life at the time, Plaintiff was still reportedly logical and without abnormal or psychotic thoughts. (Tr. 271–272). Her judgment and insight were deemed questionable, however. (Tr. 272). Dr. Austin put Plaintiff back on Seroquel and Geodon, and later started her on Effexor again. (Tr. 272, 278). Dr. Austin repeated normal findings about Plaintiff's thought processes and attention span until she stopped seeing Plaintiff in June 2008 (Tr. 278), at which point Dr. Austin noted Plaintiff's irritability, mood, and sleep had improved since starting back on medication (Tr. 268).

Plaintiff saw her primary care physician, Dr. Merheb, again in April 2008, at which point Dr. Merheb reported Plaintiff's mood to be "down with episodes of mania", but "[n]o SI or HI currently." (Tr. 247). Dr. Merheb also noted Plaintiff's "unstable social, emotional state", and "nonadherence to medications." (Tr. 248). Plaintiff had reportedly been scratching herself compulsively for an endorphine rush. (Tr. 273). With respect to Plaintiff's GI tract, Dr. Merheb reported "[n]ormal bowel movements" and "[n]o blood in stool". (Tr. 248). Plaintiff then saw Dr. Mangel again, and he referred her to another urologist "for [her] symptomatic rectocele and incont[inence]". (Tr. 267).

Plaintiff began seeing psychiatrist Ridhi Bansal, M.D., instead of Dr. Austin, in July 2008,

not long after Plaintiff's father died. (Tr. 263, 265). In the transfer of care paperwork, Dr. Austin explained that Plaintiff "has had periods of instability which have been due to her continued [a]lcohol use and at times non-compliance with medications." (Tr. 265–266). Plaintiff was depressed when she first saw Dr. Bansal, but Dr. Bansal noted "no derailment or disorganized thoughts of psychotic nature", sustained attention span and concentration, and fair judgment and insight. (Tr. 264). Dr. Bansal prescribed Geodon and Seroquel. (Tr. 264).

Dr. Bansal saw Plaintiff in September 2008 and noted she was "[f]eeling fine, [d]oing better". (Tr. 254). At that time, Plaintiff stated she had been taking her medications as prescribed, and denied any symptoms or complaints. (Tr. 255). Dr. Bansal noted no abnormal or psychotic thoughts, good judgment and insight, and a logical thought process with tight association. (Tr. 255). Dr. Bansal saw Plaintiff again in October 2008 for a followup and, according to his notes, Plaintiff then said she cannot go in crowds because she does not "want to relate" to people anymore. (Tr. 253). Her mood was depressed and she was crying during the examination. (Tr. 253). Dr. Bansal rated Plaintiff's thought process, judgment, and insight as poor. (Tr. 253).

Plaintiff was seen by internist Douglas Einstadter, M.D., in October 2008. Dr. Einstadter noted "incontinence of feces" in a list of Plaintiff's active problems. (Tr. 209). He also said Plaintiff had run out of medication at least a week earlier, and noted she "continues to drink alcohol." (Tr. 209). Resident Grace Sun, D.O., examined Plaintiff that day and noted an inguinal hernia and an umbilical hernia. (Tr. 207). In reviewing Plaintiff's gastrointestinal system, she wrote "negative symptoms (no abdominal pain, anorexia, n/v, indigestion, constipation, or diarrhea)". (Tr. 207). Regarding Plaintiff's hepatitis C, Dr. Sun wrote Plaintiff is a "poor candidate for treatment given alcoholic binges and emotional instability". (Tr. 208). Dr. Einstadter agreed that Plaintiff is not a

10

good candidate for hepatitis C treatment "until she can stop drinking". (Tr. 210).

Plaintiff has had several evaluations of her residual functional capacity (RFC) undertaken by both consultant and examining mental health professionals. The first one was conducted in July 2002, by consultant psychologist Guy Melvin, Ph.D. (Tr. 499–515). In most functional domains, Dr. Melvin found either no evidence of limitation, or only evidence of being not significantly limited. (Tr. 499–500). However, he did note moderate limitations in many aspects of social interaction and in Plaintiff's ability to respond appropriately to changes in the work setting. (Tr. 500, 512). Dr. Melvin referred to Plaintiff's answers on SSA forms as "grossly exaggerated". (Tr. 501). He characterized Plaintiff's medical impairments as personality disorder and major depressive disorder with psychotic features in partial remission with medication. (Tr. 505, 509).

Psychologist Alice Chambly, Ph.D., assessed Plaintiff's mental RFC in April 2006. (Tr. 397–414). Dr. Chambly indicated Plaintiff has the medically determinable impairments of bipolar disorder and substance addiction disorder. (Tr. 400, 405). She reported Plaintiff has moderate difficulties in maintaining social functioning, but only a mild restriction of activities of daily living and maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 407). Dr. Chambly rated Plaintiff as "not significantly limited" in almost every residual ability asked about, with five exceptions. (Tr. 411–412). That is, Dr. Chambly determined Plaintiff has a moderate limitation in her ability work in coordination with, or proximity to, others without being distracted; her ability to complete a normal workday without interruptions psychologically based symptoms; her ability to interact appropriately with the general public; her ability to accept instructions and respond appropriately to criticism from supervisors; and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 411–412). In support of her

11

findings, Dr. Chambly cited Plaintiff's high GAF score after being discharged from the hospital in March 2006. (Tr. 413). Psychologist Bruce Goldsmith, Ph.D., reviewed Plaintiff's file in October 2006 and "affirmed as written" this mental RFC assessment by Dr. Chambly. (Tr. 358).

Dr. Bansal evaluated Plaintiff's mental RFC in October 2008. (Tr. 203–203A). He ranked most of Plaintiff's residual abilities as "fair," but he check-marked "poor or none" in the following areas: following work rules, maintaining attention and concentration for extended periods of two-hour segments, dealing with the public, dealing with work stress, completing a normal workday without interruptions from psychologically based symptoms, behaving in an emotionally stable manner, and relating predictably in social situations. (Tr. 203–203A). Dr. Bansal noted on this form that Plaintiff "gets panic attacks" and has paranoid thoughts. (Tr. 203A).

Administrative Hearing

Plaintiff appeared with counsel at a hearing before the ALJ on October 16, 2008. (Tr. 614). Also appearing were medical expert (ME) Daniel Schweid, M.D., and vocational expert (VE) Kathleen Reis. (Tr. 614).

Plaintiff testified about her vocational background. She said she had just turned 55 and is a high school graduate with four years of college majoring in biology and chemistry. (Tr. 617–618). Her prior relevant work includes work as a telemarketer, machinist, laborer, bell ringer, insurance agent, and research technician. (Tr. 618).

Plaintiff testified about her medical problems. She identified her medical issues to be neck and back pain, bipolar disorder, hepatitis C, hyperthyroidism, hypertension, a swollen liver with fatty tumors, and left leg pain from a machining accident. (Tr. 618–619). Plaintiff said she has two hernias that she is afraid to have repaired. (Tr. 627). Also, as a result of a prior trauma, Plaintiff

12

testified she has an anal injury that causes fecal incontinence. (Tr. 627). Because of this injury, she cannot "hold back a soft stool", causing instances of incontinence "once or twice a week". (Tr. 627–628). This alone, Plaintiff testified, has caused her so much embarrassment as to prevent her from obtaining most kinds of jobs. (Tr. 627). Additionally, Plaintiff said it caused problems with her boss at her machining job, because her boss "just had no understanding at all" of her need to use the bathroom while working. (Tr. 631).

Plaintiff testified she is on several different medications, including three prescriptions for her psychological impairments. (Tr. 620). She explained she has had allergic reactions to, and side effects from, some medications, and stopped taking Lithium because of interactions with her thyroid medication. (Tr. 624–625).

Plaintiff testified about her prior legal trouble. She said she was incarcerated for six months on a disorderly conduct charge following a physical confrontation with her adult children and the pregnant woman living below her. (Tr. 628–629). She also spoke about her drug and alcohol use, saying she used intravenous heroin with her first husband, which is how she contracted hepatitis C. (Tr. 621–622). As for Plaintiff's alcohol use, she admitted to drinking just a few days before the hearing after her daughter moved out of her apartment. (Tr. 622). Other than that, Plaintiff explained she had been mostly sober for a year after attending rehabilitation, though she had a few drinks on about three occasions. (Tr. 623).

Plaintiff testified about her RFC. She said she walks to the grocery store, cooks dinner, can clean, and can maintain her own personal hygiene. (Tr. 629). However, there are days when she "just feel[s] really bad" and "just lay[s]" in bed. (Tr. 629). Plaintiff testified this normally occurs "around PMS time . . . every month for a couple of days". (Tr. 630). Also, Plaintiff testified she is scared of

13

people, and as a result does not have any friends and cannot ride the bus. (Tr. 642). Plaintiff said she gets really moody, aggressive, and angry, and this has caused her job problems. (Tr. 630). Plaintiff claimed she has "lost everything" – including jobs, friends, and her house – because of her bipolar disorder. (Tr. 626). "I'm always being called crazy and psycho", Plaintiff said. (Tr. 626).

 Dr. Schweid, the ME, testified about Plaintiff's impairments. He said Plaintiff has the severe physical impairments of hepatitis C, fatty liver and abnormal liver function that "could have" been caused in part by Plaintiff's alcoholism, gastroesophageal reflux, hernias, hypothyroidism, hypertension, uterine prolapse, plantar fasciitis, and a rectocele. (Tr. 632–633). The ME then described Plaintiff's psychiatric impairments, noting she has bipolar disorder, depression, and personality disorder with borderline and paranoid features, though she has a superior IQ and no intellectual impairments. (Tr. 634). After discussing various records from Plaintiff's treatment history, the ME concluded Plaintiff does not have an impairment that meets or equals a listing. (Tr. 637).

 The ME gave an opinion on Plaintiff's RFC. He said she is probably limited to light tasks given her hernias and fatigue caused by hypothyroidism and hepatitis C. (Tr. 637). Because of her substance abuse problem, the ME said Plaintiff could not be around unprotected heights or dangerous machinery, and could not drive a motor vehicle. (Tr. 637). Despite her high intellect, the ME opined that Plaintiff "would be limited to routine, low stress tasks" that are non-confrontational and do not involve high productions quotas or a high intensity of interpersonal relations. (Tr. 638). While she is intellectually capable of much greater, she is limited by her emotional state. (Tr. 638).

 Upon further questioning, the ME said Plaintiff would respond to criticism in the work place poorly. (Tr. 639). He also clarified what he meant by interpersonal relations; he said Plaintiff could

14

not be expected to do close teamwork or work in tandem with peers on the job, but could be in the vicinity of, or even close proximity to, others so long as they are not dependent upon each other's performance. (Tr. 639). Also, the ME indicated he disagrees slightly with Dr. Bansal's mental RFC assessment in the record, stating he believes Plaintiff is capable of following work rules and maintaining concentration for two-hour segments. (Tr. 640). He also said Plaintiff's stress tolerance is probably better than assessed by her psychiatrist because she will have days when her ability to complete a normal workday without interruption is better than poor. (Tr. 641). The ME further disagreed with Dr. Bansal by saying her ability to carry out simple instructions is good and her ability to socialize is fair. (Tr. 642).

The VE testified and classified Plaintiff's past work. She said Plaintiff's machinist job was a medium, skilled position. (Tr. 643–644). Plaintiff's work selling insurance was light and skilled; her work as a stamping press operator was medium, semi-skilled; her telemarketing work was semi-skilled and sedentary; her bell ringer position was light and unskilled; and finally, her door-to-door sales work was light and unskilled. (Tr. 644–645).

The ALJ then asked the VE to assume a hypothetical person who can lift or carry 20 pounds occasionally and ten pounds frequently; can stand, walk, or sit six hours a day out of an eight-hour workday; cannot be around heights, hazards, ladders, rope, or scaffold; cannot drive; can only do routine tasks with low stress and no high production quotas; cannot handle arbitration, negotiation, or confrontation; must have minimal contact with the public, co-workers, and supervisors; should not be responsible for the health, safety, or welfare of another party; cannot do managerial or supervisory work; and cannot do work involving fiduciary or fiscal responsibility. (Tr. 646). Such a hypothetical person, the VE testified, could not do Plaintiff's past work, but could perform the jobs

15

of housekeeping cleaner, merchandise marker, or mail room clerk – each of which accounts for several hundred positions in the local economy. (Tr. 646–647).

The ALJ asked the VE to assume a second hypothetical individual, having all the same restrictions and abilities as before, with the additional limitations of having no interaction at all with the public and minimal interaction with co-workers and supervisors; not being able to relate to peers, supervisors, or the public; not being able to stand the stress of daily work activity or perform activities within a schedule; not being able to do an ordinary routine independently, work without distraction, be willing to ask questions and seek assistance, or accept instructions or criticism; and not being able to be aware of hazards and precautions. (Tr. 647). The VE testified no work would be available for such an individual. (Tr. 647).

When pressed by Plaintiff's attorney about fecal incontinence, the VE admitted, "[f]ecal incontinence is, is, you know, disruptive in the workplace. . . . It requires a substantial break if it happens on the job, unscheduled. So if it happened on the job twice a week, it's likely that person would be let go. People are very uncomfortable with that." (Tr. 648).

The Commissioner's Decision

The ALJ issued an unfavorable decision on December 15, 2008. (Tr. 15–30). He determined Plaintiff met the insured status requirement for DIB through September 30, 2007. (Tr. 20). He concluded Plaintiff has the severe impairments of bipolar disorder, alcohol dependence, chronic hepatitis C, and hernias. (Tr. 21). Ultimately, though, the ALJ found Plaintiff not disabled because a substance abuse disorder is a contributing factor material to the disability he determined she is under. (Tr. 19). Without the contributions of her substance abuse, the ALJ concluded Plaintiff has the RFC to perform light work with certain additional restrictions, leaving a multitude of jobs she

16

could still perform in the local economy. (Tr. 27).

Plaintiff requested review of this decision. (Tr. 13). The Appeals Council accepted review and issued a partially favorable decision on March 4, 2011. (Tr. 2–7). The Appeals Council also issued an unfavorable decision the same day with respect to Plaintiff's application for DIB. (Doc. 17-1, at 1–7). In these two decisions, the Appeals Council reversed the ALJ's ultimate conclusion that Plaintiff has not been disabled since August 30, 2008, saying they do "not affirm the finding that there are other jobs [Plaintiff] can perform". (Tr. 5). The Appeals Council noted Medical-Vocational Rule 202.06 directs a finding of "disabled" as of Plaintiff's 55th birthday on August 30, 2008. (Tr. 6). The Appeals Council adopted the ALJ's conclusion that Plaintiff could perform a range of light work before that date, and that jobs existed in the economy she could perform. (Doc. 17-1, at 2). Thus, the final decision of the Commissioner subject to review by this Court is that Plaintiff became disabled on August 30, 2008, but not before. (Tr. 6).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474

17

F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a)(1)(E), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the

18

national economy. *Id.* The court considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.* A

claimant is only determined to be disabled if she satisfies each element of the analysis – including

inability to do other work – and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)–(f) &

416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff challenges the Commissioner's final decision by making two arguments:

> The Administrative Law Judge's finding that Plaintiff's rectocele does not constitute
> a severe impairment is not supported by substantial evidence, is prejudicial to the
> Plaintiff[,] and requires remand.

> The Administrative Law Judge did not properly evaluate the opinion of Dr. Bansal,
> the Plaintiff's treating psychiatrist.

(Doc. 17, at 13, 15). These arguments are addressed in turn.

<u>Plaintiff's Rectocele</u>

Plaintiff argues the ALJ's determination that Plaintiff's rectocele is not a severe impairment

is unsupported by substantial evidence. With respect to this impairment, the ALJ said:

> I do not find [Plaintiff's] rectocele to be a severe impairment. The evidence shows
> that she was seen on March 13, 2006 with complaints of mild fecal incontinence and
> Dr. Merlino did not feel as though her sphincter required surgical repair. On July 19,
> 2006, during an examination, [Plaintiff's] anal tone was noted to be fair. A
> colonoscopy on December 21, 2006 revealed no abnormal lesions and very small
> internal/external hemorrhoidal complexes.

(Tr. 21) (citations omitted).

As the Commissioner correctly points out, so long as at least one severe impairment is found,

it is legally insignificant which impairments are labeled severe and which are not. *See Maziarz v.*

*Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). The question of whether a

19

claimant has a severe impairment is merely a threshold inquiry. *Higgs v. Bowen*, 880 F.2d 860, 862–863 (6th Cir. 1988). Once a severe impairment is found, the analysis continues and the Commissioner must consider all the claimant's symptoms regardless of whether they are caused by those impairments deemed severe or not. 20 C.F.R. § 404.1545(e); *see Pompa v. Comm'r*, 73 F. App'x 801, 803 (6th Cir. 2003). Nevertheless, the ALJ in this case did not consider the nonexertional limitation imposed by Plaintiff's occasional fecal incontinence – a symptom well-documented in her medical records. As explained below, this is plain error that the Appeals Council did not correct. Remand is necessary.

The regulations provide that claimants may have both "exertional" and "nonexertional" limitations on their ability to work. 20 C.F.R. § 404.1569a(a). Whereas exertional limitations affect a claimant's ability to meet the strength demands of jobs (e.g., sitting, standing, walking, lifting, carrying, pushing, or pulling), nonexertional limitations affect a claimant's ability to meet the non-strength demands of jobs. 20 C.F.R. § 404.1569a(a).

Nonexertional limitations caused by incontinence are well established by case law. *See Crowly v. Apfel*, 197 F.3d 194, 198 (5th Cir. 1999) ("[W]e now conclude, as have our sister circuits, that incontinence may be an impairment for purposes of the Social Security Act and must be considered by the Commissioner in determining whether a claimant is disabled."); *Gonzales v. Sullivan*, 914 F.2d 1197, 1202 (9th Cir. 1990) ("Even though the Secretary found substantiating evidence for appellant's bladder problem, he . . . found that appellant was not disabled. The Secretary did not explain how appellant's incontinence affects his ability to work or whether incontinence constitutes a nonexertional limitation in this case. This omission is error.") (citations omitted); *Levally v. Massanari*, 11 F. App'x 695, 697 (8th Cir. 2001) (noting incontinence can cause

20

nonexertional limitations); *see also Furst v. Comm'r of Soc. Sec.*, 208 F.3d 213 (Table), at *1 (6th Cir. 2000) (noting the finding of incontinence as a severe impairment was not in dispute).

The failure to accommodate for a nonexertional limitation caused by a claimant's fecal or urinary symptoms is an error not uncommonly confronted, and consistently remanded, in recent years by this Court. Very recently, this Court remanded an ALJ's decision that failed to account for the nonexertional limitation imposed by a claimant's medically-documented frequent diarrhea. *Spencer v. Comm'r*, 2012 WL 1068876 (N.D. Ohio 2012) (report and recommendation adopted by *Spencer v. Astrue*, N.D. Ohio Case No. 1:11-CV-328, Doc. 24). Similarly, last year this Court remanded an ALJ's decision for failing to adequately consider the nonexertional limitations caused by a claimant's urostomy appliance. *Bruce v. Comm'r of Soc. Sec.*, 2011 WL 3647929, at *7–9 (N.D. Ohio 2011) (report and recommendation adopted by *Bruce v. Comm'r of Soc. Sec.*, 2011 WL 3651109 (N.D. Ohio 2011)). The Commissioner simply must consider *all* of a claimant's medically established limitations once a severe impairment has been found. 20 C.F.R. § 404.1545(e).

In this case, the ALJ determined Plaintiff's rectocele was not a severe impairment, and seems to have ignored the effects of occasional fecal incontinence, noting that surgical repair was deemed unnecessary and that at one point Plaintiff's anal tone was found to be fair. (Tr. 21). The RFC the ALJ determined Plaintiff has makes no accommodation for occasional fecal incontinence, and not once in explaining his RFC determination did the ALJ even mention Plaintiff's fecal incontinence. (Tr. 22–25). The Appeals Council subsequently affirmed every finding the ALJ made with respect to the time period between the alleged onset date and August 30, 2008 (Tr. 5–6; Doc. 17-1, at 4–5), resulting in a final decision of the Commissioner that never took into account the nonexertional limitation imposed by Plaintiff's occasional fecal incontinence.

Plaintiff's medical records establish that she has a stage two rectocele resulting in occasional incontinence of loose stool. (Tr. 334, 336, 464, 487). Plaintiff testified that she cannot hold back loose stools and experiences incontinence once or twice a week. (Tr. 627–628). The record contains substantial medical evidence verifying Plaintiff's testimony. For instance, Dr. Merlino noted a weak tone and weak squeeze upon a digital examination of Plaintiff's rectum. (Tr. 463). Dr. Merlino included incontinence in his impression of Plaintiff's condition after this examination. (Tr. 464). A subsequent anal ultrasound revealed attenuation of Plaintiff's mid to upper external sphincter "suggesting a defect", and a thin perineal body. (Tr. 467). There is no medical support in the record for ignoring this.

The Court is cognizant of the standard of review in this case, which requires the Commissioner's decision be affirmed even in the face of substantial evidence contrary to his decision, so long as substantial evidence also supports his position. *Jones*, 336 F.3d at 477. But the ALJ's decision here, which implies Plaintiff has no limitation imposed on her by her fecal incontinence, lacks the support of substantial evidence. The evidence cited by the ALJ does not show that Plaintiff does not suffer from occasional fecal incontinence. Just because Plaintiff's rectocele was deemed to not warrant surgical repair does not mean it is asymptomatic or has no impact on Plaintiff's RFC. Rather, the ALJ's evidence merely shows that Plaintiff's sphincter defect is not so severe as to necessitate surgical repair. But even if surgical repair were indicative of whether Plaintiff has fecal incontinence, Plaintiff's doctors did, in fact, plan on surgically repairing Plaintiff's rectocele while repairing her hernias. (Tr. 347).

Even though the ALJ found Plaintiff's rectocele to not be a severe impairment, his non-treatment of Plaintiff's fecal incontinence runs contrary to the procedure dictated by 20 C.F.R. §

22

404.1545(e). When the Commissioner fails to follow his own regulations, the Court must remand unless the error is harmless. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004). In this case, the VE's testimony shows this error to be anything but harmless. If Plaintiff's fecal incontinence happens just twice a week, the VE's testimony indicates she would "likely" not be able to keep a job. (Tr. 647–648).

The ALJ's RFC determination is unsupported by substantial evidence. On remand, the Commissioner must find an RFC that takes into account Plaintiff's nonexertional limitation of occasional fecal incontinence. Then, the Commissioner must apply the VE's testimony to Plaintiff's RFC and determine whether Plaintiff's occasional fecal incontinence precluded her from engaging in substantial gainful activity between the alleged onset date and August 30, 2008 (the date the Appeals Council adjudicated her disabled). The Court renders no opinion on whether this analysis should lead to a determination of disabled.

The Opinion of Dr. Bansal

Plaintiff's second argument focuses on the treating physician rule. She argues the ALJ did not properly evaluate the opinions of Dr. Bansal, one of Plaintiff's treating psychiatrists. Generally, the medical opinions of treating physicians are accorded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given

23

"controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.*  The ALJ must give "good reasons" – reasons "sufficiently specific to make clear . . . the weight [given] to the treating source's medical opinion and the reasons for that weight" – for discounting a treating physician's opinion. *Id.*; 20 C.F.R. § 404.1527(d)(2). Failure to do so requires remand. *Blakley v. Comm'r*, 581 F.3d 399, 409–410 (6th Cir. 2009).

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. A medical provider is not considered a treating source if the claimant's relationship with them is based solely on the claimant's need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502.

In this case, the ALJ explained his treatment of the various physician opinions included in the record:

> As for the opinion evidence, I give great weight to Dr. Bansal's opinion that [Plaintiff] had poor to none in various areas related to mental work capacity. I find that the areas in which he indicated she had poor to none were relevant to periods she [was] using alcohol. However, I give substantial weight to Dr. Austin's opinion that [Plaintiff] had periods of instability which were due to her "continued alcohol use and at times, noncompliance with medications." The evidence supports Dr. Austin's opinion and as [Plaintiff's] treating psychiatrist, I relied on her opinion in arriving at my decision. I give Dr. Schweid's opinion great weight in forming the residual functional capacity within this decision as it is consistent with Dr. Austin's opinion. Although Dr. Schweid indicated that he was not in complete agreement with some of Dr. Bansal's selections on the mental work capacity assessment, he indicated that he agreed with others. I give less weight to the State agency assessments as their opinion is not consistent with treating and examining physicians.

(Tr. 24). Plaintiff argues that the ALJ erred in attributing Dr. Bansal's "poor to none" indications

to times when Plaintiff was using alcohol. That is, Plaintiff maintains she was not actually using alcohol during the relevant time period, so this could not suffice as a "good reason" to discount Dr. Bansal's opinion. In actuality, the ALJ did not really give Dr. Bansal's opinion less than controlling weight; he merely read into it a fact not explicitly stated based on his consideration of the record as a whole. And because the ALJ was entitled to rely on the opinion of Dr. Austin, even to the extent it was inconsistent with that of Dr. Bansal, the ALJ's interpretation of Dr. Bansal's opinion is supported by substantial evidence.

The record shows Dr. Austin provided Plaintiff with psychotherapy and other treatment for a much longer time than did Dr. Bansal. Specifically, Plantiff saw Dr. Austin routinely for almost two years, whereas Dr. Bansal only started seeing her in July 2008 – just three months before he filled out the RFC assessment at issue. (Tr. 203–203A, 215, 263, 265). Following the logic of the treating physician rule, Dr. Austin is truly the physician who had the greater opportunity to examine and observe Plaintiff, and generally become more familiar with Plaintiff's condition. Regardless, when there are competing opinions by two treating physicians, both entitled to deference, an ALJ is constrained to choose one over the other. *Isaac v. Sec'y of Health & Human Servs.*, 110 F.3d 64 (Table), at *5 (6th Cir. 1997). As long as this choice is supported by substantial evidence, it must be affirmed. *See id.*

Here, Dr. Austin's opinion is fully consistent with the other medical evidence in the record. For two years, Dr. Austin regularly noted no psychotic or abnormal thoughts, a logical thought process, fair judgment and insight, and sustained attention span and concentration. (Tr. 215, 220, 224, 226, 228–229, 234, 238–239). This was after Dr. Ionescu commonly made very similar findings while providing Plaintiff psychotherapy over the course of several prior years. (Tr. 363, 434–435,

441, 453, 455). Meanwhile, Dr. Bansal's opinion is more restrictive, concluding Plaintiff has a poor or no ability to deal with work stress, complete a normal workday without interruption from psychological symptoms, behave in an emotionally stable manner, relate predictably in social situations, deal with the public, follow work rules, and maintain attention and concentration for extended periods of two-hour segments. (Tr. 203–203A). Not only is Dr. Bansal's opinion at odds with the consistent reports of Drs. Ionescu and Austin, but it was also contradicted by the ME's testimony. Dr. Schweid testified he disagreed with the severity of several of these conclusions by Dr. Bansal. (Tr. 640–642).

Ultimately, Dr. Austin's opinion that Plaintiff's periods of instability are related to her alcohol use (Tr. 265–266) is supported by years of mild findings from psychotherapy during periods of sobriety, consultant RFC assessments indicating no more than moderate limitations in Plaintiff's residual abilities (Tr. 358, 411–412), and the ME's testimony (Tr. 640–642). In fact, even Dr. Bansal's own records suggest Plaintiff's symptoms are less than disabling while sober and taking her medications as prescribed. For instance, two months after Dr. Bansal filled out his mental RFC assessment, he saw Plaintiff again and she was then "[f]eeling fine, [d]oing better" after taking her medications as prescribed. (Tr. 254–255). Because Dr. Austin's opinion is consistent with the other medical evidence in the record, the ALJ rightfully gave it controlling weight, and substantial evidence supports his interpretation that Dr. Bansal's "poor or none" findings are relevant to Plaintiff's periods of alcohol-induced instability. In sum, the ALJ did not err in his treatment of treating source opinions, and the mental limitations in the RFC determined by the ALJ should remain intact on remand.

26

**CONCLUSION**

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision unsupported by substantial evidence to the extent the Commissioner did not adequately consider Plaintiff's nonexertional limitation of occasional fecal incontinence. Therefore, the Commissioner's decision denying benefits is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

IT IS SO ORDERED.

_____ s/James R. Knepp, II _____
United States Magistrate Judge

27